## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

JOHN DOE,[1]

      Plaintiff,

v.

COLORADO STATE UNIVERSITY, THE BOARD OF GOVERNORS OF THE COLORADO STATE
UNIVERSITY, and TONY FRANK, individually and as agent for Colorado University;
AMY PARSONS, individually and as agent for Colorado State University;
BLANCHE HUGHES, individually and as agent for Colorado State University;
CRAIG CHESSON, individually and as agent for Colorado State University;
ARIAÑA MUÑIZ, individually and as agent for Colorado State University;
MICHAEL KATZ, individually and as agent for Colorado State University;
ERICA EXLINE, individually and as agent for Colorado State University;
DAN SCHORR, individually and as agent for Colorado State University;
JUSTIN SCHWENDEMAN-CURTIS, individually and as agent for Colorado State University,

      Defendants.

---

## PLAINTIFF'S COMPLAINT

---

**COMES NOW** the plaintiff, John Doe, by and through his attorneys, The Savela Law
Firm, P.C., and submits the foregoing Complaint against Defendants, respectfully alleges as
follows:

### THE NATURE OF THE ACTION

1.     Plaintiff John Doe (hereinafter "Plaintiff" or "Doe"), an innocent Colorado
State University ("CSU") student was accused by CSU Office of Title IX Programs and
Student Resolution Center of sexual contact with a five-year-old child at a park during
behavioral therapy school with many classmates and teachers nearby.

---

[1] Plaintiff filed a Motion for Leave to Restrict Access pursuant to D.C.COLO.LCivR 7.2 seeking authorization to
file this Complaint as a pseudonymous Plaintiff contemporaneously with this Complaint.

2.    The accusation started when Complainant, in an unrelated incident, was caught naked with his friend attempting to have sexual intercourse.

3.    On June 10, 2022, Complainant, believing he was in trouble for doing something bad, was questioned by his mother and her friend about where he learned these things and if anyone was touching him where they should not. The two adults' versions of the questions and answers differ significantly. The mother of Complainant indicated to police that Complainant named Doe while the other adult said Complainant first named a classmate and that it took "digging" to get Complainant to accuse Doe. Another witness indicated the mother told her Complainant would not answer open ended questions and only said Doe did something when his mother asked specifically.

4.    On July 20, 2022, CSU's Title IX Coordinator, Defendant Ariaña Muñiz, served Doe a formal Notice of Investigation and Allegations and informing Doe that the university had placed a restriction on any internship placements that involve working with vulnerable populations. Ex. 14. The Notice informed Doe that he "is presumed not responsible for alleged conduct until a determination regarding responsibility is made at the conclusion of the formal process." *Id.*

5.    The Weld County District Attorney thoroughly investigated the claims, and after reviewing the investigative reports and watching the forensic interviews, decided not to file charges for several reasons, including, but not limited to, the following four reasons:

   a.    There is a question as to whether the victim would be found competent to testify;

   b.    The victim's description of events lacked the type of detail juries typically require to convict on such serious charges;

   c.    There are not clear opportunities of periods of isolated contact where the assaults could have occurred;

   d.    The penis challenge on YouTube that is referred to by the victim's

mother provides an alternative explanation for the victim's sexualized

knowledge.

Ex. 7.

6. The CSU Office of Title IX Programs and Student Resolution Center

Investigator conducted interviews and obtained reports from the Erie Police Department.

7. Notably, the investigator did not obtain the Forensic Interviews of the child.

8. Doe attempted to obtain these Forensic Interviews. Erie Police policy

requires the parent or guardian of a child sign a release to provide the Forensic Interviews.

Doe provided this information to CSU Investigators requesting them to obtain the Forensic

Interviews with the help of the parents. Doe indicated the Forensic Interviews were

necessary for a proper understanding of the case, and indicated he may want a Forensic

Psychologist to review the interviews for the hearing. Ex. 8, Ex. 9, Ex. 10, Ex. 16, Ex. 18.

9. According to the CSU Investigators, the parents refused to cooperate with

CSU to obtain the Forensic Interviews.

10. Doe requested to review the CSU investigation file during the investigation.

CSU denied this request. Ex. 13, Ex. 15.

11. Doe indicated that his statement to Erie Police on video is his statement, and

if there are specific questions after reviewing it, he would consider responding to those in

writing. Doe had a copy of the video. Ex. 25. CSU obtained their own copy. No questions

were sent to Doe.

12. CSU investigated this case for nearly a year.

13. On May 30, 2023, CSU Office of Title IX Programs and Student Resolution

Center sent notice of a hearing scheduled on June 7, 2023. Ex. 1. In this notice, Doe first

learned of the additional charge of abuse.

14. Included with the notice of hearing was a copy of Defendant, Investigator

Erica Exline's 55-page Student Conduct Investigation report summarizing her investigation,

as well as some supporting documents (32 additional pages). Ex. 2. This was Doe's first opportunity to review the investigation.

15.     Doe learned on May 30, 2023, that the Forensic Interviews were not a part of the investigation file.

16.     Doe requested time to conduct investigation, including hiring a Forensic Psychologist to review the file and offer an opinion. Doe's expert indicated she needed until late July to review and provide an opinion. In part due to COVID, the expert was backlogged on trials and could not review for several weeks.

17.     CSU gave some relief, but not enough. CSU set the hearing for June 29, 2023, with full knowledge that Doe's expert would not be available. Ex. 17.

18.     CSU provided the Hearing Officer with the same Investigation Report and documents as Doe. Notably absent was a copy of Doe's video interview with police. CSU only provided the Hearing Officer with Investigator Exline's summary of that interview. Doe wanted the Hearing Officer to review the interview firsthand and make his own findings. It is unknown why CSU did not provide the video interview of Doe. Doe would have signed any release or given any permission or provided his copy.

19.     Prior to the Hearing, Doe was informed that neither he nor his advisor/attorney would be allowed to question the witnesses. Instead, Doe could submit questions in advance of the hearing in writing. These questions would be reviewed by the Hearing Officer for "relevance." If found relevant, the questions would be asked. Follow-up questions by Doe were not permitted. Doe timely submitted a long list of questions. Ex. 19A; Ex. 20A.

20.     At the hearing, the Hearing Officer refused to ask numerous questions submitted by Doe. The only explanation was that they were not relevant.

21.     At the hearing, several key witnesses refused to attend, including Complainant, Complainant's mother (Witness 1) who was the outcry witness, mother's

friend (Witness 14) that was present during the outcry and told police a story that conflicted with mother, police officers that interviewed mother and friend, and other requested witnesses.

22.     At the hearing, certain witnesses attended, but refused to discuss information specific to the case because it was privileged, specifically the forensic interviewer and the SANE nurse. Complainant's mother (Witness 1) refused to sign releases so these witnesses could discuss the privileged information.

23.     CSU did not hire a forensic psychologist to review the case or provide any information about the highly specialized field of properly interviewing a child for legal purposes. Any five-year-old is highly susceptible to numerous issues in interviews that cause them to be unreliable. Here, the outcry questioning of a five-year-old was highly suggestive, specifically refusing to accept that a classmate was the perpetrator, and the mother suggesting by name Doe and Doe's employment. Despite these issues, the investigation, hearing, and appeal found the University supplied substantial evidence supporting a finding of responsibility.

24.     This five-year-old child was in behavioral therapy due to his autism diagnosis.

25.     The CSU Investigator, with no training or experience in child interviewing, determined that the five-year-old Complainant was credible.

26.     The CSU Investigator found the mother of Complainant credible despite conflicting accounts of two other witnesses.

27.     On July 13, 2023, the Hearing Officer found Doe responsible for sexual assault and abuse. Ex. 21.

28.     The Hearing Officer's finding did not consider the failure of the Complainant, Complainant's mother, or Complainant's mother's friend to testify and face questioning.

29.     The finding did not consider the lack of expert Forensic Psychologist

evidence regarding the unreliability of Complainant's statements.

30. The finding accepted the investigator's summaries as accurate without any ability to review the notes of the interviews. The summaries include statements of credibility that were not tested at the hearing.

31. The finding was supported by testimony requiring expert qualification without an expert testifying.

32. The finding failed to address the issues raised by the Weld District Attorney.

33. Doe filed a timely appeal and included new evidence, specifically the report of a Forensic Psychologist expert that is qualified to testify in court on these cases. Ex. 22, Ex 23. Doe reiterated the reason previously stated that expert report was not available at the hearing. The expert report discussed the need to review the Forensic Interviews and raised numerous issues that related to the reliability of the allegation. The expert indicated that making a decision without reviewing the Forensic Interviews was dangerous. Ex. 23.

34. The appeal was denied. Many issues raised in Doe's appeal were not addressed. The expert report was denied as not relevant, not new evidence, and speculative. Ex. 24.

35. Doe was expelled from CSU with no ability to return. His transcript is permanently marked with some form of Expelled Responsible for Sexual Misconduct.

**PARTIES**

36. Plaintiff, John Doe ("Plaintiff" or "Doe") is a resident of the State of Colorado and was, until his expulsion on August 11, 2023, enrolled as a full-time student at the Colorado State University.

37. Colorado State University (CSU) is a highly regarded public university system in the State of Colorado and is administered by the Board of Governors of the Colorado State University, which consists of nine voting members charged by Colorado's Constitution with the general supervision of the university system and the exclusive control and

direction of all funds of and appropriations to the university system unless otherwise provided by law. *See* C.R.S. § 23-30-101, § 23-30-102.

38.     Tony Frank ("Defendant Frank") is a natural person and, upon information and belief, is a President of the State of Colorado, and, at all times relevant herein the Chancellor for the CSU System. Defendant Frank previously served as the President of CSU Ft. Collins. He was appointed to his position in 2015.

39.     Amy Parsons ("Defendant Parsons") is a natural person and, upon information and belief, is a resident of the State of Colorado, and, at all times relevant herein the President of CSU in Ft. Collins. Defendant Parsons was appointed to this position on February 1, 2023. and acts as the chief executive and academic officer of the campus. She is responsible for implementing the policies, procedures, and codes pursuant to which the investigation, hearing, and appeal against Plaintiff was carried out, and for hiring CSU Title IX Director Ariaña Muñiz, Title IX Investigator Erica Exline, Hearing Officer Dan Schorr, Student Resolution Director Michael Katz, and Appeal Chair Justin Schwendeman-Curtis. Defendant Parsons is the University official charged with the disclosure of student records to a third party. Defendant Parsons reports to the Board of Governors.

40.     Dr. Blanche Hughes, ("Defendant Hughes") is a natural person and, upon information and belief, is a resident of the State of Colorado, and, at all times relevant herein the Vice President for Student Affairs at CSU. Defendant Hughes oversees Craig Chesson, Student Resolution Center, Title IX Director Ariaña Muñiz, and the Office of Title IX Programs and Student Resolution Center. Defendant Hughes reports to Amy Parsons.

41.     Craig Chesson, ("Defendant Chesson") is a natural person and, upon information and belief, is a resident of the State of Colorado, and, at all times relevant herein the Assistant Vice President for Student Affairs & Dean of Students. Defendant Chesson versees Student Resolution Center Director Michael Katz, Title IX Director Ariañia, Title IX Investigator Erica Exline, Hearing Officer Dan Schorr, Appeal Chair Justin

Schendeman-Curtis, and the Office of Title IX Programs and Student Resolution Center. Defendant Chesson reports to Dr. Blanche Hughes.

42.     Ariaña Muñiz, ("Defendant Muñiz") is a natural person and, upon information and belief, is a resident of the State of Colorado, and, at all times relevant herein Title IX Coordinator and Director.

43.     Michael Katz, ("Defendant Katz") is a natural person and, upon information and belief, is a resident of the State of Colorado, and, at all times relevant herein Director of the Student Resolution Center.

44.     Erica Exline, ("Defendant Exline") is a natural person and, upon information and belief, is a resident of the State of Colorado, and, at all times relevant herein Investigator for Office of Title IX Programs and Student Resolution Center on Doe's case.

45.     Dan Schorr, ("Defendant Schorr") is a natural person and, upon information and belief, is not a resident of the State of Colorado, and, at all times relevant herein University Hearing Officer on Doe's case.

46.     Justin Schwendeman-Curtis, ("Defendant Schwendeman-Curtis") is a natural person and, upon information and belief, is a resident of the State of Colorado, and, at all times relevant herein Staff Chair of the Appeal Committee on Doe's case.

47.     Unless otherwise specified, Plaintiff will refer to all defendants collectively as "Defendants."

48.     Upon information and belief, none of the parties to this action are in the military service, minors, or incompetent persons.

**JURISDICTION AND VENUE**

49.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, specifically 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq.*, as well as the Fifth and Fourteenth Amendments to the United States Constitution. Accordingly, this Court has jurisdiction in this matter pursuant to 28

U.S.C. §§ 1331 and 1343.

50.     Upon information and belief, Defendants has expressly waived immunity under the Eleventh Amendment of the Constitution of the United States for the state law claims presented in this action.

51.     Doe filed Notice of Injury by a Public Entity and an employee thereof pursuant to C.R.S. § 24-10-109. Ex. 12 (CGIA mail proof).

52.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C.§ 1931 as the defendants are residents of the state in which this district is located, and a substantial part of the events or omissions giving rise to this claim occurred in this district.

53.     Incorporating the State of Colorado's statutes of limitations (see C.R.S. § 13-80-102), the two-year statute of limitations for this matter has not expired.

## FACTUAL BACKGROUND

### A.     TITLE IX

54.     On June 23, 1972, the president of the United States signed into law Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. Title IX is a comprehensive federal law that protects people from discrimination based on sex in education programs or activities that receive federal financial assistance.

55.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." Where sex-based discrimination is intentional, Title IX is enforceable through a cause of action for which money damages are available.

56.     Title IX applies to schools, local and state educational agencies, and other institutions that receive federal financial assistance from the U.S. Department of Education (DOE).

57.    Both the Department of Education (DOE) and the Department of Justice (DOJ) have promulgated regulations under Title IX that require schools to "adopt and publish grievance procedures" that provide for the "prompt and equitable resolution" of student complaints alleging any action which would be prohibited by Title IX regulations. *See* 34 C.F.R. § 106.8(c) (DOE); 28 C.F.R. § 54.135(b) (DOJ). Such prohibited actions include all forms of sexual harassment, including certain types of unwelcome sexual conduct, sexual assault, dating violence, domestic violence, and stalking. *See* 34 C.F.R. § 106.30(a).

58.    The DOE's current Title IX regulations, amended in 2020, took effect on August 14, 2020, and apply to any sexual harassment allegations occurring after that date. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106). The 2020 amendments to the Title IX regulations added specific, legally binding steps that schools must take in response to notice of alleged sexual harassment. The 2020 amendments to the Title IX regulations also introduced several due process protections for respondents accused of sexual harassment and limited the application of Title IX for off-campus (*i.e.*, non-school related) incidents and parties no longer affiliated with the school.[2]

59.    The Title IX regulations require universities, such as CSU, to comply with the grievance process set forth in 34 C.F.R. § 106.45. Any provision, rules, or practices adopted by a university as part of the grievance process "must apply equally to both parties." *Id.* § 106.45(b).

60.    The university's grievance process must "[r]equire an objective evaluation of all relevant evidence – including both inculpatory and exculpatory evidence – and provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness." *Id.* § 106.45(b)(1)(ii).

61.    The university's grievance process must require that the Title IX Coordinator,

---

[2] *See Victim Rights Law Center*, 552 F. Supp. 3d 104, 117 (D. Mass 2021).

investigator, decision-maker, or any person designated to facilitate the resolution process "not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent." The university must ensure that these individuals receive training, including training in "how to conduct an investigation and grievance process"; "how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias"; and "issues of relevance to create an investigative report that fairly summarizes relevant evidence." All materials used to train these individuals "must promote impartial investigations and adjudications" of sexual harassment complaints. *Id*. § 106.45(b)(1)(iii).

62.     The university's grievance process must "[i]nclude a presumption that the respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process." *Id.* § 106.45(b)(1)(iv).

63.     The university's grievance process must "[s]tate whether the standard of evidence to be used to determine responsibility is the preponderance of the evidence standard or the clear-and-convincing evidence standard," and that standard of evidence must be applied to all formal complaints of sexual harassment. *Id.* § 106.45(b)(1)(vii). The preamble explains that the preponderance of the evidence standard means the decision-maker must determine whether alleged facts are more likely than not to be true. 85 Fed. Reg. at 30,386 n. 1472, 30,388 n. 1480. The preamble also explains that the clear-and-convincing standard means the decision-maker must determine whether it is "highly probable" that the alleged facts are true. *Id.* at 30,386, n. 1473.

64.     The Title IX regulations require universities, such as CSU, to provide training to their Title IX personnel to "accurately identify situations that require a response under Title IX." 85 Fed. Reg. at 30,093; *see also* 34 C.F.R. § 106.45(b)(1)(iii). While schools are required to respond to sexual harassment allegations that occur in an education program or activity when allegations are related to sexual harassment that may have occurred

outside the education program or activity, Section 106.45(b)(3)(i) expressly provides for mandatory dismissal of allegations in a formal complaint when the allegations concern conduct that did not occur in the university's education program or activity. 85 Fed. Reg. at 30,201.

65. The Title IX regulations require universities, such as CSU, to investigate the allegations in a formal complaint, and if the conduct alleged in the complaint did not occur in the university's education, program, or activity, then the university must dismiss the formal complaint. *Id*. § 106.45(b)(3)(i); *see also id*. § 106.44(a) (defining "education program or activity" as "locations, events, or circumstances over which [the university] exercised substantial control over both the respondent and the context in which the sexual harassment occurs"). A school has discretion to use its own student-conduct process to address alleged misconduct not covered by the Title IX regulations.

66. The U.S. Department of Education's Office of Civil Rights (OCR) enforces Title IX to ensure that institutions that receive federal financial assistance from the Department of Education comply with the law. In addition to its enforcement activities, OCR provides information and guidance to schools, universities, and other educational institutions and agencies to assist them in voluntarily complying with the law.

67. In some instances, the guidance that OCR issues directly responds to emerging trends in discriminatory behavior, inquiries or requests OCR receives for technical assistance or clarification, and complaint investigations. When precedent-setting cases in the courts clarify specific elements of application of the law, OCR may provide guidance to help ensure that the public understands how decisions apply. OCR issued guidance documents addressing questions regarding the DOE's 2020 Amendments to the Title IX Regulations on Sexual Harassment, dated between September 2020 and July 2021.

68. CSU is required to comply with applicable state and federal statutes, including Title IX.

**B.     SEXUAL MISCONDUCT AT CSU**

69.     CSU adopted a policy entitled *Title IX Sexual Harassment* ("Title IX Policy" or "Policy") that prohibits sexual misconduct and provides that individuals found responsible for violating the Policy will be subject to sanctions. Ex. 5 (*Title IX Sexual Harassment*, Policy Id# 12-015-001); *see also* Ex. 6 (*Policy and Procedure Manual*, Policy 117, CSUS Board Legal Services Policy). The grievance procedures described in CSU's *Procedures for Investigating and Responding to Complaints and Sexual Harassment under Title IX Law and Regulations* ("Title IX Procedures" or "Procedures") guide how CSU will investigate and respond to complaints of sexual harassment under the CSU Title IX Policy. Ex. 3. The Title IX Procedures provide for a "prompt and equitable resolution of matters" that are subject to Title IX Regulations and CSU Title IX Policy. *Id.* at 3 (Section 1, Introduction).

70.     If, however, CSU determines that a complaint or incident is not covered under Title IX law and regulations because the incident does not meet the definition of "sexual harassment" under Title IX, CSU's Title IX Procedures do not apply. Such sexual misconduct is instead governed by the Student Conduct Code, in cases where the responding party is a student. *Id.* at 3 (Section 2, Scope and Applicability) ("[T]he University reserves the right to determine which procedures to apply to a formal complaint and to specify one procedure for multiple allegations in a complaint, even where some allegations may fall with the Title IX regulations, and some may not."). CSU can arbitrarily choose the level of due process to apply to a complaint.

71.     For students who are accused of sexual misconduct that are deemed to fall within the Office of Title IX Programs, CSU executes a higher level of due process protections than it does for those who are accused of sexual misconduct deemed to fall under the Student Conduct Code by

        a.     Allowing review of the full investigation file during the investigation and prior to setting a hearing and the ability to respond to allegations

throughout the grievance proceedings. *Id*. at 7 (Section 6.A.6, Parties' Expectations); *see also id*. at 15 (Section 12.D.5, Investigation Procedures).

b.   Requiring all individuals designated by CSU as Title IX Coordinator, investigator, decision-maker, or other administrators to be trained on the issues involved in the investigation. *Id.* at 8 (Section 6.B.3, Requirements of Administrators).

c.   Requiring all individuals designated by CSU as Title IX Coordinator, investigator, decision-maker, or other administrators to be trained on how to conduct an investigation, hearing, appeal, or any relevant procedure, as appropriate, and how to serve impartially. *Id*. (Section 6.B.5, Requirements of Administrators).

d.   Requiring hearing officer to be trained on issues of relevance and evidence. *Id*. (Section 6.B.7, Requirements of Administrators).

e.   Requiring investigator to be trained on issues of relevance in creating investigation reports. *Id*. (Section 6.B.8, Requirements of Administrators).

f.   Providing written notice to the Parties that the Respondent is presumed not responsible. *Id*. at 12 (Section 10.5, Notice to Parties)

g.   Conducting hearings where there is a presumption that the Respondent is not responsible for the alleged conduct. *Id*. at 17 (Section 14.A.2, General Provisions).

h.   Designating investigator based on specific training and experience. *Id*. at 13 (Section 12.A.1, Designation of Investigator).

i.   Requiring thorough, unbiased, and impartial investigation and investigation report. *Id*. (Section 12.A.1, Designation of Investigator).

j.   Providing the opportunity for parties and advisors to inspect and review

any evidence obtained in the investigation that is directly related to the allegations, even if the University does not intend to use that evidence in reaching its determination. *Id*. at 15 (Section 12.D.5, Investigative Procedures).

k.  Providing a minimum of 10 business days to submit a written response to be considered by the investigator prior to completion of the investigative report. *Id.* (Section 12.D.5, Investigative Procedures).

l.  Requiring that all evidence obtained in the investigation to be available to the parties at the live hearing and considered by the hearing officer. *Id*. (Section 12.D.5, Investigative Procedures).

m.  Granting extensions of time in circumstances where there is good cause. *Id*. at 15 (Section 12.F, Deadlines/Extensions of Time). Good cause may include absence of a witness. *Id*. at 18 (Section 14.A.5, General Provisions).

n.  Requiring an investigation report that fairly summarizes the relevant evidence, including inculpatory and exculpatory evidence and requiring that each party have 10 business days to review and respond, in writing, to the investigation report. *Id*. at 15-16 (Section 12.G, Investigation Report).

o.  Providing for a hearing if, after the final investigation report is referred to Student Conduct Services for review, it is determined that the evidence may constitute a violation of the policy. *Id*. at 16 (Section H.3 Referral to Student Conduct Services).

p.  Requiring that the burden of proof to establish responsibility rests with the University. *Id*. at 18 (Section 14.A.3, General Provisions).

q.  Requiring a live hearing where all parties are expected to participate, and

providing that a failure by the impacted party to participate may result in their complaint being dismissed. *Id.* (Section 14.B.1, Hearing Procedures).

r.  Allowing a party's advisor to be present at the hearing for the purpose of advising the party and conducting cross-examination of other parties and witnesses orally and in real time. *Id.* (Section 14.B.2, Hearing Procedures).

s.  Not allowing the decision-maker to rely on statements of parties or witnesses that do not submit to cross-examination. *Id.* at 19 (Section 14.B.6, Hearing Procedures).

72.     CSU reserves the right to determine which procedures to apply to a formal complaint and to specify one procedure for multiple allegations in a complaint, even where some allegations may fall within the Title IX regulations while others do not. *Id.* at 3 (Section 2, Scope and Applicability).

73.     The CSU Student Resolution Center (SRC) handles complaints of sexual misconduct or sexual assault for the CSU Ft. Collins campus that the Office of Title IX Programs determines do not fit within the Title IX regulations. Ex. 5 at 20 ("Sexual misconduct that does not fall within the definition of sexual harassment under the Title IX regulations is subject to different procedures than those for Title IX matters.") Rather, the SRC uses the methods generally described in the Student Conduct Code. Ex. 4.

74.     The Student Conduct Code is required to comply with the U.S. Constitution, federal statutes, federal administrative regulations, the Colorado Constitution, Colorado Revised Statutes, and State of Colorado administrative regulations. Ex. 4 at 2 (Jurisdiction).

75.     The Student Conduct Code provides significantly less due process than the Title IX Procedures for identical claimed behavior. At the time of the investigation of Doe, the Student Conduct Code specifically included the following:

a.  While sexual misconduct investigations begin in the Office of Title IX for

a preliminary inquiry[3] (Ex. 3 at 9), none of the protections of the Title IX Procedures are provided when a case proceeds under the Student Conduct Code, even though the prohibited conduct and sanctions are the same, thereby denying due process to respondent students;

b.    While the Title IX Procedures place the burden of proof on the University (Ex. 3 at 18), the Student Conduct Code states "the standard of proof required is a preponderance of the information contained in the record," (Ex. 4 at 14) requiring production of evidence by the student, thereby denying due process to respondent students;

c.    Employment of a victim-centered investigation model which negates fundamental notions of impartiality and objectivity in sexual misconduct investigations and fails to address victim misconduct in which the alleged victim could stand accused of the same prohibited behavior as alleged to have been committed by the respondent student;

d.    A failure to provide respondent students and the hearing officer access to the full investigation file, including, but not limited to, police reports, police videos, medical documents or reports, forensic interviews, and unredacted statements of complainant and witnesses, that are used by the investigator to make the investigation report, at any time, including prior to responding to an interview request or interview by investigators, and including prior to or during the hearing, thereby denying due process to respondent students;

e.    A failure to electronically record any witness statement taken by investigators, including those made by a complaining witness (a non-

---

[3] "The preliminary inquiry may include, but is not limited to, information gathering from the parties, soliciting written statements, meeting with witnesses, and gathering other information necessary to make decisions as to the appropriate resolution." Ex. 3 at 9.

investigator notetaker may be employed), thereby denying due process to respondent students;

f.   A failure to allow review of notes taken during each interview, instead only allowing respondent students to read a summary of what the investigator deemed relevant, thereby denying due process to respondent students;

g.   A failure to require witnesses to provide their statements under oath or affirmation of truthfulness or otherwise subject those providing statements to any penalty of perjury, thereby denying due process to respondent students;

h.   A failure to permit confrontation and cross-examination of witnesses in any meaningful fashion during an investigation (as you cannot review the statements, you cannot submit questions that were not asked or for clarification), thereby denying due process to respondent students;

i.   Respondent's only ability to ask questions at a hearing is to submit questions in advance of the hearing for review by the hearing officer. If the hearing officer decides a question is relevant, the question will be asked without the ability for Doe to follow up. In this case, numerous cross examination questions submitted by respondent were not asked. *See* Ex. 19A, 20A. These were deemed irrelevant by a person without sufficient training or any training or experience in child abuse investigations, suggestibility, memory contamination, confirmation bias and other issues related to the reliability of interviews of a child, thereby denying due process to respondent students;

j.   The determination of relevance and redaction of interviews and evidence in preparing the investigation report is made by an

investigator with no training or experience in child abuse investigation, child forensic interviewing, suggestibility, memory contamination, confirmation bias and other issues relating to reliability in a child victim case, thereby denying due process to respondent students;

k.    There is no review by a forensic psychologist qualified to assess the reliability of the child and investigation by the investigator, thereby denying due process to respondent students;

l.    The hearing officer does not have experience or training in child abuse investigation assessment for reliability, as most criminal judges would, thereby denying due process to respondent students;

m.    A redacted summary of the relevant facts in the investigation was provided at the time the hearing was set, without sufficient time to plan a proper defense investigation, including review by a forensic psychologist to assess the evidence, thereby denying due process to respondent students;

n.    A failure to provide a meaningful appeal of the result or sanction imposed upon respondent students being found responsible for Code violations, thereby denying due process to respondent students.

*See* Ex. 3; Ex. 4; Ex. 5.

76.    Sanctions available under both the Student Conduct Code (Ex. 4 at 15-16) and the Title IX Policy (Ex. 5 at 20-21), upon a finding of responsibility, include:

a.    Disciplinary Probation

b.    Loss of Good Standing

c.    Disciplinary Suspension

d.    Deferred Disciplinary Suspension

e.    Disciplinary Expulsion

**C.   THE ALLEGATIONS AGAINST DOE**

77.   On June 11, 2022, Witness 1, mother of the five-year-old male Complainant, reported to Erie Police Officer Katz that her son was sexually assaulted by Doe while he was a Registered Behavior Technician at Wild Sun Behavioral Services between March 25, 2022 and May 25, 2022. Ex. 26 at 3-5 (Erie Police Department Report); *see also* Ex. 2 at 34 (CSU Student Conduct Investigation Report).

78.   Witness 1 stated that on June 10, 2022, she and her friend, Witness 14, discovered Complainant and Witness 14's five-year-old male child naked, and learned that Complainant had requested the other child to insert his penis in Complainant's anus. Ex. 26 at 3-5.

79.   Witness 1 and Witness 14 brought Complainant downstairs alone and asked if anybody had been touching him where they should not be and who had been touching him. *Id.* at 3-5, 13.

80.   According to Witness 14, Complainant initially indicated that something like that happened one to two weeks prior with a named friend. Witness 14 stated "it took some digging for [Witness 1] to get information from [Complainant] and he did not immediately tell her [Doe] had done something to him." Witness 14 stated "[Complainant] first told her a classmate had touched him. [Witness 1] was asking [Complainant] if anything happened anywhere else and if anything happened at school and eventually [Complainant] mentioned [Doe]." Ex. 26 at 13; *see also* Ex. 2 at 36-37 (Investigation Report omitting the phrase "and he did not immediately tell her [Doe] had done something to him").

81.   Witness 4, a Behavior Analyst at Wild Sun, indicated that in mid-June 2022, Complainant's mother, Witness 1, told Witness 4 that she had "asked the minor about it, 'where did you hear this from, where did you learn this.'" Witness 4 reported hearing from Witness 1 that the "minor did not respond to" open-ended questions, but when Witness 1

asked "with options, like at Wild Sun and she asked who it was this with, like [Doe], and he said [Doe]." Ex. 2 at 23, ¶4.

82.    According to the summary of Witness 1's investigative interview, when asked whether Complainant's statements were prompted or whether any names were provided or suggested, Witness 1 stated that Complainant "was not prompted." *Id.* at 12, ¶1. Witness 1 also stated Complainant identified Doe by name when first asked "has someone been doing this to you." *Id.* ¶ 2.

83.    On June 13, 2022, Director and Title IX Coordinator Ariaña Muñiz directed the commencement of a formal Office of Title IX Programs investigation of Doe after she learned of an Erie Police investigation regarding possible sexual misconduct concerning a five-year-old child at Doe's place of employment that allegedly occurred between March and May 2022. Ex. 2 at 3.

84.    On June 21, 2022, Erie Police Detective Crow observed a Blue Sky Bridge forensic interview of Complainant by forensic interviewer Martha Hawkinson. Detective Crow made a report of the interview. Ex. 26 at 8-9.

85.    Detective Crow's report warns, "this report is not meant to be a verbatim account of the video and any statements or actions contained within. This report was written from officer recollection with minimal (if any) review of available recording(s)." *Id.* at 8, ¶2.

86.    Detective Crow's report indicates that forensic interviewer Hawkinson asked Complainant "if anything has happened with parts of his body that he was not okay with and he stated, 'No.'" *Id.* ¶4.

87.    Detective Crow's report indicates that forensic interviewer Hawkinson asked Complainant "if anyone has wanted to look at or touch parts of his body and he state, "No.'" *Id.*

88.    A break was taken, then forensic interviewer Hawkinson asked Complainant,

"if he has ever talked to anyone about his body parts and [Complainant] said no." Then, when forensic interviewer Hawkinson asks again whether "he has talked to anyone about his body," he said "yeah." When asked to tell more, Complainant says "I don't know." *Id.* ¶6.

89. After another break, during which Complainant leaves the room, spends time in another room,[4] and then returns to the room, forensic interviewer Hawkinson asks about the child Complainant was found naked with on June 10, 2022. Complainant identified the child as his friend and told her "[w]e did bad stuff" and "motioned toward his penis." *Id.*

90. Forensic interviewer Hawkinson then asked "where he learned that stuff from" and Complainant stated, "from [Doe]." When asked repeatedly to tell her about what happened with Doe, Complainant repeatedly said "I don't know" and "appeared visibly frustrated." The forensic interview was then terminated. *Id.* at 9, ¶1.

91. Forensic interviewer Hawkinson described the interview to Complainant's parents, including Witness 1. A second interview was discussed and agreed to. *Id.* ¶2.

92. The June 21, 2022 forensic interview was video recorded and a copy was booked into evidence by Detective Crow.

93. A second forensic interview was held on June 28, 2022. Detective Crow made a report of the interview. Ex. 26 at 11-12.

94. Detective Crow's report warns, "this report is not meant to be a verbatim account of the video and any statements or actions contained within. This report was written from officer recollection with minimal (if any) review of available recording(s)." Id. at 11, ¶2.

95. In the second forensic interview, Complainant provided similar information as the first interview. When asked "where he was when it happened," Complainant to her

---

[4] The investigation report does not indicate whether Complainant communicated with anyone during this break.

"it was at a tree" and called it "a circle tree." Complainant then stated, "the tree was small and they had to hide behind it" and "positioned his body sideways to show how they would hide behind it." Complainant also suggested in a drawing that there was a second tree. *Id.* ¶ 3-4.

96.    Forensic interviewer Hawkinson continued to ask questions about "pee pee and butts" and Complainant repeatedly responded, "I don't know." *Id.* at 11-12.

97.    Complainant stated that he told a teacher about it, but indicated he didn't know which teacher. *Id* at 12, ¶1. No teacher or school staff reported that Complainant told them about it.

98.    Detective Crow collected a video recording of the June 28, 2022 interview and booked it into evidence. *Id.* ¶2.

99.    Following the interview, Detective Crow went to the park to try to identify the tree. Detective Crow reports "I was unable to determine which tree(s) [Complainant] had talked about." *Id.* ¶3.

100.    Neither forensic interview video was obtained by CSU Investigators. Witness 1 refused to allow Erie Police to provide copies of the forensic interviews to CSU Investigators.

101.    Doe requested copies of the forensic interviews from Erie Police. Erie Police Department refused citing privacy concerns of Complainant. Erie Police Department indicated that the forensic interviews and other unreleased portions of the file could be provided with a signed release from Complainant's parents.

102.    Doe requested CSU investigators obtain a copy of the forensic interviews.

103.    Forensic interviewer Hawkinson testified at the hearing, but since there was not a release of information, she could not talk about her work on this case.

104.    On July 1, 2022, Sexual Assault Nurse Examiner (SANE) Elyse Diewald reported the results of her forensic exam for Complainant to Detective Crow via voice

message. She stated Complainant told her "[Doe] had touched his private parts and also touched his bottom with a stick and it hurt." Ex. 26 at 15. A stick was never mentioned previously. Complainant had not previously mentioned pain, nor any other sensory experience. Experts indicate that sensory experiences are easily recalled, whereas many other details are not.

105.     On July 10, 2022, Detective Crow reviewed the SANE evaluation form. A few quotes are provided. While some areas were "normal" and some "abnormal," there is no indication as how this relates to the claims in this case. Ex. 2 at 31-32, 37-38.

106.     The Investigation Report indicates that SANE Diewald (Witness 8) observed redness is normal for young children and often related to hygiene. *Id*. at 38, ¶4.

107.     The Investigation Report indicates that "[r]esults from Impacted Party's SANE exam" were received on February 27, 2023. *Id*. at 6, 8.

108.     None of the SANE reports were available for Doe to review at any time. The Hearing Officer was not allowed to review any of the SANE reports either.

109.     SANE Diewald testified at the hearing, but since there was not a release of information, she could not talk about her work on this case.

110.     On June 13, 2022, Detective Crow summarized an email received from Wild Sun. The email stated that Doe had worked with two other children. The parents of one child reported their child said, "he was never inappropriately touched or had anything said to him and he did not notice anything to any other children." Ex. 26 at 20.

111.     On July 7, 2022, Detective Crow spoke with the mother of the other child with whom Doe worked. This parent "informed me her son had not disclosed any abuse by [Doe] and she hasn't observed anything out of the ordinary." *Id*.

112.     Erie Police spoke with Doe's co-workers at Wild Sun. No one saw anything specific. These co-workers described Doe away from the group but inside the classroom. According to Witness 1 and the forensic interview notes, Complainant never said anything

happened inside the school building, only at the park. Co-workers generally dispute significant alone time at the park. Questions submitted regarding alone time at the park were not asked by the Hearing Officer. Questions submitted regarding alone time in the classroom were not asked by the Hearing Officer.

113.    The Director of Wild Sun indicated their policies prevented any adult from being alone with a child. The Director indicated the layout of the school should prevent unobserved interaction between an adult and child.

114.    Doe was let go from Wild Sun due to "inability to listen to feedback." He was handed a signed letter from owner Daniel Kurty stating the reasons why he was being let go. Doe was not a good fit and did not get along well with his coworkers. Additionally, the letter referenced that Doe was still within the 90-day trial period of his employment, as Doe started the job on March 28, 2022 and was terminated on May 24, 2022. He was not let go from the job due to anything related to this false accusation. This accusation came only after Doe had parted ways with Wild Sun.

115.    On July 5, 2022, Doe gave a voluntary, video recorded statement to an experienced Erie Police Department child abuse Detective, without notice of the claims, and prior to obtaining counsel. Doe later submitted this video recorded statement to CSU Office of Title IX Investigators as his statement. Ex. 25. The Hearing Officer did not view the statement. Instead, it was summarized in the Investigation Report. Ex. 2 at 14-18; Ex. 11.

116.    On July 20, 2022, Defendant Muñiz served Doe with a Notice of Investigation and Allegations informing Doe that he was being investigated for sexual misconduct and sexual assault on a non-CSU affiliated minor in violation of CSU Student Conduct Code. Doe was notified that he "is presumed not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the formal process." Doe was also notified that he "may have a single advisor" whose role "is to provide support and guidance" but the advisor "cannot participate in place of a party." CSU placed a

restriction on any internship placements that involve working with vulnerable populations. Ex. 14.

117. On December 7, 2022 and January 11, 2023, Doe requested access to the entire CSU Office of Title IX investigation file and requested certain evidence be requested. Ex. 10.

118. Doe's request for access to the CSU Office of Title IX investigation file was denied by CSU Office of Title IX Investigators. Doe independently requested and received portions of the redacted Erie Police Department reports.

119. On February 28, 2023, CSU Office of Title IX obtained a copy of the Weld County District Attorney's Filing Decision letter regarding the investigation. The letter stated that, after reviewing the investigative reports, it had been decided that "[t]he case will not be filed." Ex. 7.

120. The letter, addressed to Detective Crow, stated that the Weld County District Attorney declined to file charges in the case after their investigation, citing insufficient evidence, questions regarding victim competency, victim's lack of detail supporting charges, lack of clear opportunities or periods of isolated contact where assaults could have occurred, and a specific alternative explanation for the victim's sexualized knowledge. *Id*.

121. Complainant's parents refused to sign releases to allow the full investigative file to be reviewed by CSU Investigators, including the two child forensic interviews.

122. On May 11, 2023, Defendant Exline submitted the Student Conduct Investigation Report (Ex. 2) which cherry-picked and massaged facts taken from witnesses' recollections in a preordained finding of fault.

123. Investigators presented with contradictory facts consistently selected those facts which shaped an investigative conclusion of responsibility. For example,

   a. Witness 14, who is a friend of Witness 1 (Complainant's mother) and present when Complainant's mother questioned Complainant about

sexual activity, stated, "it took some digging for [Complainant' mother] to get information from [Complainant] and he did not immediately tell her [Doe] had done something to him. [Complainant] first told her a classmate had touched him. [Complainant's Mother] was asking [Complainant] if anything happened anywhere else and if anything happened at school and eventually [unknown] mentioned [Doe]." Ex. 26 at 13.

b.  In contrast, Witness 1, Complainant's mother, told Detective Crow that she asked two questions of Complainant, 1) has anyone been touching you where they should not be? 2) Who has been touching you? *Id*. at 3.

c.  Complainant's mother did not tell police or the CSU Office of Title IX Investigators that Complainant initially identified a classmate.

d.  Witness 1 told the CSU Investigator, "No, he did not" when asked specifically if Complainant initially named a classmate. Ex. 2 at 14, ¶1.

e.  According to the CSU Office of Title IX Investigator interview, Witness 1 (Complainant's mother) stated "impacted party was not prompted" regarding whether information was suggested. *Id*. at 12, ¶1.

f.  Witness 1 also stated Complainant identified Doe by name when first asked has anyone been doing this to you. *Id*.

g.  CSU Office of Title IX Investigators did not interview Witness 1's friend (Witness 14) who was present during this questioning – Witness 14 provided a different account to Detective Crow.

h.  Based on a second interview with Witness 1, it appears the other adult present during the outcry was Witness 14. *Id.* at 13-14.

i.  During the second interview, when asked about the "penis challenge," Witness 1 described an incident that had happened "months prior" to

the incident in which Complainant and another child, the son of Witness 13, were caught by Witness 13 "showing their penises but there was no touching or nakedness at all." *Id*. at 13. CSU Office of Title IX Investigators chose not to request contact information of Witness 13. *Id.* at 14.

j.  Witness 1 refused to provide Witness 14's contact information to CSU Office of Title IX Investigators. *Id*. at 5.

k.  While Witness 1 claimed Witness 14 was too upset to be involved, therefore she did not want to give contact information, there is no indication in Detective Crow's report indicating the same. Witness 1's claim regarding Witness 14's desires came about 9 months after Witness 14's statement to Detective Crow. It is likely that Witness 1 knows the contents of Witness 14's statement and Witness 1 is upset.

l.  There is no notation of the contradictions between Witness 1 and Witness 14 in the section entitled Witness 1's Credibility Assessment. *Id*. at 47.

m.  These issues support that Witness 1 is not credible, needs to be cross-examined, that the claims were suggested to a five-year-old child and are not reliable, confirmatory bias is present, the source of the information was not the child, the child is confabulating two events happening with two different people, and the necessity for forensic interview video review.

n.  Witness 1 refused to provide contact information for Witness 14 and refused to allow access to the forensic interviews.

o.  Investigators decided not to ask for Witness 13's contact information. Witness 13 is the parent of the child Complainant identified prior to

saying anything about Doe.

p. Despite these issues, the investigation, hearing, and appeal found the University had supplied substantial evidence supporting a finding of responsibility.

q. Witness 4, a Behavior Analyst at Wild Sun, indicated that Witness 1 said to Witness 4 in June 2022 "Witness 1 asked the minor about it, 'where did you hear this from, where did you learn this." Witness 4 reported that the minor did not respond to open-ended questions, but when Witness 1 asked "with options, like at Wild Sun and she asked who it was this with (sic), like [Doe], and he said [Doe]." *Id.* at 23, ¶4. Witness 4 contradicts Witness 1 and supports Witness 14. Witness 1's credibility is questionable at best. Witness 1's questioning of a five-year-old is highly suggestive, specifically refusing to accept that a classmate did things to the child and substituting by name Doe and Doe's employment. Despite these issues, the investigation, hearing, and appeal find the University has supplied substantial evidence supporting a finding of responsibility.

124. On May 30, 2023, CSU SRC provided Doe with notice of a hearing scheduled for seven days later, on June 7, 2023. Ex. 1. The notice listed the claimed charges and a copy of the 90-page Student Conduct Investigation Report produced by Defendant Exline, Investigator. *See* Ex. 2. This was the first time CSU provided any portion of its investigation to Doe.

125. Doe requested additional time prior to the hearing, including requesting the hearing be set in late July so that his Forensic Psychologist could review the file and provide a report. A later hearing date was granted for June 29, 2023, but without enough time for the expert to review the file or provide a report. *See* Ex. 17.

126.    In compliance with the Student Conduct Code (Ex. 4), Doe submitted questions to be asked of the witnesses. *See* Ex. 19, 19A, 20, 20A; *see also* Ex. 26.

    a.    The questions were designed to clarify Witness statements that were general and overbroad claims without frequency, dates, or time frames.

    b.    Co-worker witnesses claimed Doe immediately alienated himself from all other therapists, that Doe was regularly violating clear rules, and yet no one reported or disrupted his severe rule violations. Witness 3 (Executive Director) and Witness 4 (Doe's supervisor) were surprised that Doe would be able to be alone with the child enough to accomplish the claimed acts. The rules of the school are designed to prevent an adult from being alone with a child. Co-workers that did not like Doe, and claimed to notice disturbing behavior, also claim they failed to do anything to ensure Doe was not alone with the child.

    c.    Doe's questions designed to provide an alternate reason for the child being lethargic and non-social, specifically that he was sick with COVID like symptoms during this time frame, were not asked.

    d.    Doe submitted questions designed to bring out training and experience of the interviewer and other witnesses on child abuse investigations, including those regarding common child interview errors, were not asked because they were found not relevant.

    e.    Nearly all of Doe's questions were deemed irrelevant and were not asked.

127.    Witness 1 refused to participate in the hearing despite being the outcry witness.

128.    On July 13, 2023, the Hearing Officer, Defendant Dan Schorr, and Director of SRC, Defendant Michael Katz, provided the hearing result and sanction. Doe was found

responsible and expelled, effective immediately. Ex. 21.

129. Doe submitted his timely appeal on July 27, 2023, including the expert Forensic Psychologist's report. Ex. 23.

130. On August 11, 2023, the Staff Chair of the Appeal Committee, Defendant Justin Schwendeman-Curtis, issued the final decision denying the appeal. Ex. 24.

131. Defendant Schwendeman-Curtis's review was "limited to the record of the hearing and the supporting information that was evaluated in the decision-making process." *Id.* at 1.

132. Defendant Schwendeman-Curtis found that the hearing was not conducted unfairly, that a thorough investigation occurred, and that Doe had "ample opportunity to participate in the investigation process so [Doe's] perspective could be incorporated into the investigation report." *Id.*

133. Defendant Schwendeman-Curtis found that Doe had "ample opportunity to review the information to be considered by the hearing officer in making their determination" and further found that the hearing officer asked any relevant questions of the witnesses who appeared at the hearing. *Id.*

134. Defendant Schwendeman-Curtis found that the information presented in the case was "sufficient to establish by a preponderance of the evidence that a violation of the Student Conduct Code occurred." *Id.* at 2.

135. Defendant Schwendeman-Curtis found that the Forensic Psychologist's report submitted with the appeal was not "new information" even though it was not available at the time of the hearing and further found that the report was "based on speculation of presumed knowledge of Detective Crow" and not "sufficiently relevant to the final determination." *Id.*

136. Doe hired a Forensic Psychologist to review the forensic interviews and the investigation report and to give an expert opinion on the reliability of Complainant's

statements. An expert report was provided as a part of the appeal. *See* Ex. 23. The CSU

Appeal Chair deemed the report irrelevant. This determination was based on the expert

using speculative information, specifically Detective Crow's report of the interview. CSU

Investigator relied upon the same information in its Investigation Report. Ex. 2 at 5 (stating

"Witness 9 . . . directed the Investigator to the police report and to the forensic interview

summaries with Impacted Party").

137.     Based upon the foregoing, Plaintiff moves this Court to find that the

defendant has violated Doe's Constitutional and Statutory Rights as set forth below:

**COUNT I**

**(DECLARATORY JUDGMENT- VIOLATION OF DUE PROCESS
PROVISIONS OF THE UNITED STATES CONSTITUTION)**

138.     Plaintiff repeats and incorporates all of the allegations of this Complaint as if

fully set forth herein.

139.     This Count is brought against all Defendants.

140.     The Fifth Amendment to the United States Constitution, made applicable to

the State of Colorado by the Fourteenth Amendment, provides that no person shall "be

deprived of life, liberty, or property, without due process of law."

141.     The Fourteenth Amendment to the United States Constitution provides that

no state shall deprive "any person of life, liberty, or property, without due process of law."

142.     The Due Process clauses of the United States Constitution are implicated by

higher education disciplinary decisions, including the disciplinary decisions under the CSU

Title IX Policy and Procedures, as well as the CSU Student Conduct Code.

143.     CSU has a constitutional obligation to provide a fundamentally fair and

reliable process.

144.     Doe is entitled, under the Constitution of the United States, to the opportunity

to be heard in a meaningful manner by CSU's Office of Title IX and CSU's Student Resolution

Center.

145.  Doe's interest in the outcome of the investigation is significant:

   a.  Expulsion from the Colorado State University denies him the benefits of education at his chosen school.

   b.  Expulsion damages Doe's academic and professional reputation.

   c.  A finding of responsibility has already damaged Doe's personal reputation.

   d.  Expulsion prevents Doe from re-enrolling at CSU and impairs his ability to enroll at a different institution, thus impairing his ability to pursue his higher educational and career prospects.

146.  Defendants violated Doe's due process rights in the following manners:

   a.  By investigators failing to allow Doe to review the full investigative file, and therefore Doe did not receive adequate notice of the nature of his alleged violation;

   b.  By implementing an investigative process which did not record or allow Doe to review the contemporaneous notes taken of the interviews, and instead only allowed Doe and the Hearing Officer to review summary statements which were redacted by CSU investigators (who removed information that they alone deemed not relevant);

   c.  By failing to provide adequate notice to Doe of the nature of the allegations against him;

   d.  By implementing an investigative process which failed to place witnesses under an oath or affirmation to tell the truth, thereby rendering witness statements unreliable as to their truthfulness;

   e.  By using the preponderance of the evidence standard, which is too low of a standard because the University could impose a sanction of

expulsion, directly against Doe's property right, which is a quasi-criminal procedure and sanction;

f.  By refusing to place the burden of proof on the school or the accuser, and instead placing the burden on Doe;

g.  By the investigator refusing to obtain video recordings of the two forensic interviews of Complainant, limiting cross examination, and preventing review by a forensic psychologist, thereby denying due process to Doe;

h.  Despite the Complainant refusing to sign releases to allow access to the two forensic interview videos, no negative inference or weight was given to the claims, thereby denying due process to Doe;

i.  Despite the investigation taking place over approximately one year, CSU allowed Doe no access to the investigative file during the investigation so that the Doe could understand the case against him and plan a proper defense investigation, including review by a forensic psychologist to assess the evidence, thereby denying due process to Doe;

j.  By the investigator and hearing officer making determinations requiring expert testimony without such testimony, thereby denying due process to Doe;

k.  By the Appeal Committee Chair refusing relief based on the new evidence of a forensic psychologist report discussing the lack of reliability of the investigation, incorrectly ruling that it could have been made available by the continued hearing date, thereby denying due process to Doe;

l.  By the Appeal Committee Chair refusing relief based on the forensic

psychologist report discussing the lack of reliability of the investigation, deciding that it was not relevant to the hearing, calling it speculative, when it was based on a police report that Office of Title IX investigator used for her investigation report, thereby denying due process to Doe.

m.  By the investigators demonstrating bias against those accused of sexual misconduct, the majority of whom are males. By way of example:

   i.   CSU did not allow Doe to review its investigation file, but instead only allowed Doe to review a summary.

   ii.  In Doe's case, the CSU Investigators found multiple discrepancies that they failed to properly resolve.

   iii. CSU employs a victim-centric model of investigation, under which Doe was denied his right to remain silent.  CSU Policy and Procedure and the CSU Student Conduct Code allow investigators to assign a finding of responsibility based solely on a complainant's statement using the preponderance of the evidence standard.

   iv.  Under CSU's Student Conduct Code, Doe was presumed responsible and had to prove himself innocent.

   v.   CSU's Investigator, Hearing Officer, and Appeal Chair lacked training and experience investigating child abuse cases where the primary evidence is a five-year-old child's statement, especially one given in response to suggestive questioning, with confirmatory bias, memory problems, confabulation, and other issues requiring expertise to understand what is relevant and why.

   vi.  The Investigator, Hearing Officer and Appeal Committee Chair

did not follow the relevant evidence standard.

vii. CSU refused to allow time or provide an adequate extension for Doe to have an expert review the case, issue a report, and potentially appear at the hearing. Ex. 18.

viii. Upon reviewing the expert report during appeal, CSU deemed it irrelevant in part claiming it was based on speculation when it is based on the same police report portions of the CSU Investigation Report was based.

ix. CSU failed to consider the necessity of review of the full video recordings of the two forensic interviews of the child, instead accepting the admittedly incomplete notes of an officer.

x. CSU failed to consider or assess Witness 1, child's mother's, motives.

xi. Failure of Investigator or Hearing Officer to properly assess the credibility of the outcry witness, Witness 1 (mother of Complainant). Witness 1's friend, Witness 14, was the only other adult present during the outcry. Witness 14 described the events very differently, specifically the moments during the interview leading up to the so-called outcry. Neither witness appeared at the hearing with no negative inference or weight given to testimony.

xii. CSU failed to provide cross examination of important witnesses, including Witness 1, Witness 13, and Witness 14.

xiii. CSU failed to assess the sufficiency of evidence where cross examination was not allowed, and Witness 1 refused to release major portions of the police and prosecution file that resulted in

the District Attorney's No File Decision.

xiv.   Despite having many options available, CSU will only consider expulsion.

147.    Doe asserts that CSU's Title IX Policy and Procedures and the Student Conduct Code, violate the Due Process clauses of the United States Constitution.

148.    Defendants have a duty to enforce the provisions of the CSU Policy and Procedure and the Student Conduct Code in a fundamentally fair manner with a reliable process but has instead unfairly and inappropriately created and enforced those policies against Doe.  The investigation, hearing, and sanctions against Doe were arbitrary and capricious. Defendants were aware of the investigation against Doe and did nothing to correct the Constitutional shortcomings.

149.    Doe is entitled to a declaration that the OIEC Process, as applied to him, violates the Due Process clauses of the United States Constitution.

150.    Pursuant to 42. U.S.C. § 1988, Doe is entitled to his attorney's fees incurred in bringing this action.

**COUNT II**

**(DECLARATORY JUDGMENT- VIOLATION OF DUE PROCESS PROVISIONS OF THE CONSTITUTION OF THE STATE OF COLORADO)**

151.    Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

152.    This Count is brought against all Defendants.

153.    Article 2, § 16 of the Constitution of the State of Colorado provides that the accused shall enjoy the "right to appear and defend in person and by counsel; . . . to meet the witnesses against him face to face . . . and a speedy public trial *by an impartial jury* . . ." (emphasis added).

154.    Article 2, § 18 grants the right against self-incrimination.

155. Article 2, § 25 declares that "no person shall be deprived of life, liberty or [sic] property, without due process of law."

156. The Due Process clauses of the Constitution of the State of Colorado are implicated by higher education disciplinary decisions, including the disciplinary decisions under the Colorado State University Office of Title IX Process and Procedures and Student Resolution Center Code.

157. Defendants have a constitutional obligation to provide a fundamentally fair and reliable process.

158. Doe is entitled, under the Constitution of the State of Colorado, to the opportunity to be heard in a meaningful manner by Colorado State University Office of Title IX Process and Procedures and the Student Conduct Code.

159. Defendants violated Doe's rights under the Constitution of the State of Colorado in the same manner that he violated Doe's rights under the Constitution of the United States, as alleged in Count 1.

160. Doe is entitled to a declaration that the Student Conduct Code, as applied to him, violates the Due Process clauses of the Constitution of the State of Colorado.

161. Pursuant to C.R.S. § 14-10-119, Doe may be entitled to his attorney's fees incurred in bringing this action.

## COUNT III
### (42 U.S.C. § 1983—VIOLATION OF DUE PROCESS PROVISIONS OF THE UNITED STATES CONSTITUTION)

162. Plaintiff repeats and incorporates all allegations of this Complaint, as if fully set forth herein.

163. This Count is brought against all Defendants.

164. Defendants acted under color of law in violating Doe's rights under the Fifth and Fourteenth Amendments to the United States Constitution.

165. Defendants acted intentionally and with callous disregard for Doe's clearly established constitutional rights.

166. Defendants' actions against Plaintiff have caused and continue to cause substantial, immediate, and continuing damage to him, to include prejudicing his acceptance into other academic institutions (including community college), diminishing his reputation, and causing undeniable anxiety and depression.

167. Pursuant to 42 U.S.C. § 1983, Doe is also entitled to have any record of the investigation and subsequent sanction expunged from his academic record and to have his identity remain confidential.

168. Pursuant to 42 U.S.C. § 1988, Doe is entitled to his attorney's fees incurred in bringing this action.

### COUNT IV
### (BREACH OF CONTRACT)

169. Plaintiff repeats and incorporates all allegations of this complaint as if fully set forth herein.

170. This Count is brought against all Defendants.

171. Based on the aforementioned facts and circumstances, CSU created express and implied contracts when Plaintiff accepted an offer of admission to CSU and paid tuition and fees.

172. In consideration of this payment, CSU published policies and procedures applicable to Doe and other students attending CSU and made a warranty that they would follow those policies and procedures.

173. Based on the foregoing facts and circumstances, CSU breached express and implied agreements with Doe.

174. A non-exhaustive list of CSU's breaches throughout its investigation of the Plaintiff include the following:

a.   Failure to conduct a prompt, fair, and impartial investigation, a prompt and equitable resolution, or a fair hearing, as provided in Colorado State University Office of Title IX Policy and Procedure and the Student Conduct Code's overview, mission statement, and process.

b.   Failure to comply with Article X of the Bylaws of the Colorado State University System by not acting in good faith; by not being personally accountable for individual actions such as overriding the Complainant's request for privacy; by not conscientiously fulfilling obligations towards others in terms of providing notice and due process; and by failing to communicate ethical standards of conduct through instruction and example, such as not permitting a fair inspection of investigative records and not providing adequately trained and experienced investigators and hearing officers on a unique case outside the normal purview of the Office of Title IX and Student Resolution Center, by not providing adequate investigation and hearing procedures on such unique cases and those that likely result in expulsion.

c.   Failure to comply with policies established by the Board of Governors by not conducting the investigation ethically, and in compliance with Colorado State University Office of Title IX Policy and Procedures and the Student Conduct Code, Due Process, Title IX, and university policies.

d.   Discrimination in the investigation of Doe on the basis of sex in violation of federal law and university policy.

e.   Failure to adequately notify Doe of allegations and failing to properly preserve witness statements by choosing not to record and preserve said statements and instead actively redacting information from witness statements that investigators alone determine is not relevant;

failing to provide unredacted witness statements prior to demanding a statement from Doe, to include SANE, forensic interviews, and police reports; by failing to provide any fair understanding of the evidence against Doe until the hearing was set seven days later so that a defense could prepare, including the opportunity to hire an expert witnesses.

f.    Failure to provide meaningful opportunity to respond to allegations presented, including fair cross examination.

g.    Failure to consider the Weld District Attorney's reasons for not filing a criminal case in determining the sufficiency and value of the evidence.

h.    Failure to gain required knowledge of the suggestibility of witnesses, memory contamination, confabulation and other common forensic psychological issues used to evaluate the reliability of a child's statement.

i.    Failure to properly analyze the information gathered during the investigation and instead concluding that it is "more likely than not" that the conduct occurred despite the fact that the evidence was insufficient to sustain even this low burden of proof.

175.    Defendants were aware of these actions in this case and did nothing to ensure a fair disciplinary process.

176.    Doe had achieved all credits needed to graduate except for completion of "SOWK 488 - Field Placement" and "SOWK 492 - Seminar," which are typically taken concurrently.

177.    As a direct, reasonable, and foreseeable consequence of this breach, Plaintiff has sustained damages including, without limitation, emotional distress, economic and reputational harm, an inability to complete his studies and degree at CSU, detrimental impact on his future career and higher education prospects, and other direct and consequential damages.

178.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT V
## (VIOLATION OF TITLE IX)

179.     Plaintiff repeats and incorporates all of the allegations of this Complaint as if fully set forth herein.

180.     This Count is brought against the CSU Board of Governors.

181.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

182.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant CSU Board of Governors.

183.     Students attending public universities such as CSU who have been accused of sexual misconduct, have a right to due process under Title IX.

184.     Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline.

185.     Challenges to university disciplinary proceedings for sex discrimination can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

186.     The Tenth Circuit has framed the question for summary judgment as, "Could

a reasonable jury – presented with the facts alleged – find that sex was a motivating factor in the University's disciplinary decision?" *Doe v. DU*, 1 F.4th 822, 830 (10th Cir. 2021).

187.    CSU engaged in selective enforcement. Upon information and belief,[5] as compared to female students accused of sexual misconduct, the number of male students found responsible for policy violations is far greater. As compared to females found responsible for the same violations of CSU's sexual misconduct policy, CSU has imposed far more severe and unduly harsh sanctions on male students.

188.    In cases where male students are accused, CSU has also engaged in a pattern of building cases against innocent men in order to garner a reputation that the University is taking sexual assault victims seriously. Upon information and belief,[6] sexual misconduct cases involving female students are not referred to law enforcement and are handled privately by the University.

189.    An "erroneous outcome" occurred in Plaintiff's case. Plaintiff was innocent and wrongly found to have committed a violation of CSU's policies, and gender bias was a motivating factor.

190.    In a child sexual assault case, accused male students are not given due process protections such as fair and impartial process, thorough and complete investigation, proper training and experience, ability to present a defense, proper evaluation of witness credibility, motive, reliability, competency, requiring expert testimony on subjects requiring it, placing the burden of production on the University, fair notice of the charges and investigation, the presumption of innocence or "not responsible," as shown by the actions of the investigator, hearing officer, and appeal committee chair. Female students are treated differently in child sexual assault claims.

---

[5] This information is exclusively within CSU's possession, custody and control and is not publicly reported. Accordingly, Plaintiff needs to obtain discovery in order to assess this claim.
[6] This information is exclusively within CSU's possession, custody and control and is not publicly reported. Accordingly, Plaintiff needs to obtain discovery in order to assess this claim.

191.     CSU failed to conduct an adequate, reliable, and impartial investigation of these allegations because, without limitation:

      a.    CSU Investigator Defendant Exline, who was responsible for determining the outcome of Plaintiff's case, failed to personally conduct interviews with Complainant, Witness 14, Witness 13, and failed to obtain or review the Forensic Interviews, instead relying on summaries of interviews by Erie Police Department;

      b.    Investigator Defendant Exline and the Hearing Officer, without any training on child forensic interviewing, presumed that Complainant was truthful in his account, despite significant outcry issues as described by Witness 14 and Witness 4, which caused the investigators to ignore a wealth of exculpatory evidence that contradicted Complainant's story. The investigators' findings that both Complainant and his mother were credible was belied by the evidence collected in both the Erie Police Department and Weld County District Attorney investigations;

      c.    Given the utter lack of evidence that Doe engaged in sexual misconduct, the Investigator, Hearing Officer, and Appeal Chair relied on a grossly inaccurate credibility assessment in finding Doe responsible and, evidently, misapplied the preponderance of the evidence standard;

      d.    Doe had no method through which he could ask questions of witnesses or cross-examine witnesses that did not appear at the hearing, and no inference against their credibility, reliability, motive, or other negative inference was found;

      e.    A single untrained and inexperienced person decided the appeal without presenting it to the appeal committee.

192.     Circumstances suggest that gender bias was a motivating factor behind the

erroneous finding and the decision to impose an unjustly severe penalty upon Plaintiff. These circumstances include, without limitation:

      a.    Upon information and belief, investigators received "trauma-informed investigation" training which perpetuated the idea that complainants' story of sexual assault should not be questioned, that trauma excuses all memory lapses and credibility issues, and that complainants always tell the truth. This approach caused investigators to overlook exculpatory evidence and profound inconsistencies in Complainant's accounts of what happened, ignoring the unique nature of interviewing young children;

      b.    The investigators applied different standards of credibility, motive and reliability to statements of Complainant and Witness 1 than in the analysis of statements of Plaintiff.

193.    Upon information and belief, Defendant CSU possesses communications and documents evidencing a predisposition to against males charged with child sexual misconduct.

194.    Upon information and belief, Defendant CSU has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of sexual misconduct.

195.    Upon information and belief, Defendant CSU's mishandling of Complainant's allegation was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

196.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and punished severely for it.

197.    As a direct and proximate result of the above conduct, Plaintiff sustained

damages including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

198.    As a result of CSU's violation of Title IX, which resulted in an unduly severe and unwarranted sanction which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing CSU to (i) reverse the outcome and findings; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's expulsion from his education file; and (iv) permanently destroy any record of these allegations.

199.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VI
### (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

200.    Plaintiff repeats and incorporates all allegations of this Complaint as if fully set forth herein.

201.    This Count is brought against all Defendants.

202.    Based upon the aforementioned facts and circumstances, CSU breached and violated the covenant of good faith and fair dealing expressed and implied in its contract with Plaintiff by making an unsupported finding of responsibility and by meting out the disproportionately severe sanction of expulsion where there was a lack of credible evidence concerning the claims against him.

203.    As a direct, reasonable, and foreseeable consequence of these breaches, Plaintiff has sustained damages including, without limitation, emotional distress, economic and reputational harm, an inability to complete his studies at CSU, detrimental impact on his future career and higher education prospects, and other direct and consequential

damages.

204.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VII
## (ESTOPPEL AND RELIANCE)

205.    Plaintiff repeats and incorporates all of the allegations of this Complaint as if set forth herein.

206.    This Count is brought against all Defendants.

207.    CSU's various policies constitute representations and promises by CSU that the university should reasonably expect to induce action or forbearance by Plaintiff.

208.    CSU expected (or should have reasonably expected) Plaintiff to accept its offer of admission, to incur tuition and fee expenses, and choose to not attend other universities based on its express and implied promises that CSU would not tolerate, and Plaintiff would not suffer, harassment by fellow students and would not deny Plaintiff his procedural rights should he be accused of a violation of CSU's policies.

209.    To his detriment, Plaintiff relied on these express and implied promises and representations made by CSU.

210.    Based on the foregoing, CSU is liable to Plaintiff based upon the principal of estoppel.

211.    As a direct, reasonable, and foreseeable consequence of these breaches, Plaintiff has sustained damages including, without limitation, emotional distress, economic and reputational harm, an inability to complete his studies at CSU, detrimental impact on his future career and higher education prospects, and other direct and consequential damages.

212.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be

determined at trial plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

213.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

214.    Plaintiff respectfully requests the following relief:

a.    On Count I, judgement declaring that the CSU Policy and Procedure and the Student Conduct Code, as applied to this case, violates the Due Process clause of the United States Constitution.

b.    On Count II, judgment declaring that the CSU Policy and Procedure and Student Conduct Code, as applied to this case, violates the Due Process clause of the Constitution of the State of Colorado.

c.    On Counts III-VII, judgment in favor of Doe awarding damages in an amount to be determined at trial.

d.    Removal of the expulsion order issued by CSU, thus allowing Doe to enjoy a clear transcript and restoration of his status as a student, prohibiting further disciplinary proceedings against him, removing any mention of the CSU investigation and subsequent sanction from his record, and enjoining the Defendants and their agents from disclosing his true identity.

e.    Court costs, interest, and other reasonable expenses incurred in maintaining this action, including reasonable attorneys' fees as authorized by 42 U.S.C. § 1988, C.R.S. § 14-10-119, and any other statute permitting recovery of attorneys and costs.

**JURY DEMAND**

215.    Plaintiff hereby demands a trial by jury of all triable issues in the present

matter.


Respectfully submitted this 29th day of July 2024 by


/s/ Jason Savela
Jason Savela, Esq.
The Savela Law Firm, PC
3825 Iris Ave, Suite 100
Boulder, CO 80301
720-821-1001
jason@savelaw.net

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify the on this 29th day of July 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

*/s/ Jason Savela*